# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

KATHRYN ARRINGTON,

    Plaintiff,

v.

SUN LIFE ASSURANCE COMPANY OF
CANADA and
UNION SECURITY INSURANCE
COMPANY,

    Defendants.

Civil Action No. TDC-18-0563

## MEMORANDUM OPINION

Plaintiff Kathryn Arrington has filed a civil action against Defendants Sun Life Assurance Company of Canada ("Sun Life") and Union Security Insurance Company ("Union Security") alleging that Defendants violated the terms of a long-term disability insurance policy by partially denying her benefits. Arrington seeks a declaratory judgment, pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132 (2012), that Defendants erroneously determined that Arrington's disability claim was overpaid and that Defendants are not entitled to reimbursement of benefits already paid to Arrington. Defendants, in turn, seek an order requiring Arrington to reimburse them for the overpaid benefits. Presently pending before the Court are the parties' Cross-Motions for Summary Judgment. The Court held a hearing on the Motions on May 16, 2019. For the reasons set forth below, Defendants' Motion is GRANTED IN PART and DENIED IN PART, and Arrington's Motion is DENIED.

**BACKGROUND**

I.     **The Policy**

      Arrington is a Board-certified doctor of veterinary medicine who works as a staff internal-medicine specialist and the Medical Director for Beltway Veterinary Cardiology, Inc. ("BVC"). In addition to being BVC's Medical Director, Arrington owns 50 percent of BVC's shares. BVC has elected, for purposes of federal taxation, to be taxed pursuant to subchapter S of the Internal Revenue Code and so is an "S-corporation."

      BVC has sponsored a group employee benefit plan that provides long-term disability benefits for some of its employees. Beginning on November 1, 2007, BVC contracted with Union Security to administer the long-term disability benefit plan and underwrite and provide benefits pursuant to Policy No. G 5,308,504 (the "Policy"). The Policy is an employee welfare benefit plan governed by ERISA, 29 U.S.C. § 1002(1). Arrington is covered by the Policy.

      For employees eligible for benefits under the Policy, the Policy "pays a monthly benefit designed to partly replace income lost during *periods of disability* that result from *injury*, sickness, or pregnancy." Administrative Record ("A.R.") US000019, ECF No. 42. By the terms of the Policy, BVC gives "sole discretionary authority" to Defendants both to interpret the Policy's terms and to decide which claimants may receive benefits. *Id.* at US000032. For an employee deemed to be disabled, the amount of the monthly benefit is based on the claimant's monthly pay before becoming disabled ("Monthly Pay") and generally represents 60 percent of that calculated amount, but is offset by certain pay or benefits received during the period of disability, including retirement benefits or other disability benefits, and is subject to a maximum and minimum amount. The Policy requires the claimant to provide Defendants "with all of the information we specify as necessary" to determine if benefits are due, including "tax returns, business records," and "payroll

2

and attendance records." *Id.* If a claimant received more or less than the benefit due under the Policy, the benefit is to be adjusted. In the case of an underpayment, the Policy requires Defendants to pay the claimant the difference between the amount originally paid and the amount that should have been paid. In the case of an overpayment, the Policy requires the claimant to reimburse Defendants by the amount overpaid. The Policy does not expire upon a particular date; rather, it terminates only upon certain conditions, such as nonpayment of premiums or notice of termination by the policyholder. The Policy does, however, permit Defendants to alter premium rates under certain circumstances but generally not more often than once per year.

## II.    Initial Benefit Determination

On March 9, 2015, Arrington filed a long-term disability claim under the Policy after a disability prompted her to reduce the number of days she worked and to transfer clinical duties to other members of BVC's veterinary team. On the claim statement, Arrington reported that she earned $5,000 in salary on a biweekly basis and that she had a 50 percent ownership stake in BVC. On May 4, 2015, Defendants approved her claim, finding that Arrington had become disabled for purposes of the Policy in September 2014 and was due benefits retroactively, starting in December 2014. Although Defendants agreed to pay monthly benefits to Arrington, since her benefit would be calculated based on her pre-disability earnings, Defendants requested Arrington's 2013 tax records, including Internal Revenue Service ("IRS") Form W-2 and Schedule K-1 of IRS Form 1120S, and her pay stubs from September 2014 forward. In Schedule K-1 of IRS Form 1120S ("Schedule K-1"), an owner of an S-corporation reports the ordinary business income of the S-corporation, the owner's share of income, business deductions, and credits, including any distributions of cash the owner received from the S-corporation during the relevant tax year ("S-Corporation Distributions").

Arrington sent Defendants her 2013 tax return and pay stubs on July 20, 2015. Defendants referred her claim to an outside accountant at CPA Risk Services, Inc. to calculate her pre-disability Monthly Pay and her benefit. The accountant, Judy Bogdanovich, reviewed the Policy and the submitted documents and found that Arrington was due the maximum benefit allowed under the Policy, $6,000 per month, but also concluded that Arrington's Schedule K-1 was "needed to finalize the pre-disability Monthly Pay." *Id.* at US000405. Bogdanovich recommended that Defendants request Arrington's Schedule K-1 for 2013 and request that Arrington provide records relating to any S-Corporation Distributions she received from BVC after the onset of her disability. On August 19, 2015, Arrington sent to Defendants her 2013 Schedule K-1. On August 28, 2015, Defendants were informed by email that Arrington did not receive any S-Corporation Distributions from BVC after December 2014.

Based on the additional information, Bogdanovich calculated that Arrington's total pay in 2013 was $200,750, comprised of $130,250 in wages and $70,500 in S-Corporation Distributions reported in her Schedule K-1, resulting in a pre-disability Monthly Pay of $16,729.16. Based on this pre-disability Monthly Pay and the payroll records attesting that Arrington's post-disability salary had decreased to $11,083 per month for the period up to May 1, 2015, Bogdanovich calculated that the monthly benefit due to Arrington from December 2014 to May 1, 2015 was the maximum benefit of $6,000 per month less an offset of $353.84. Because her salary was further reduced to $5,416.67 per month starting in May 2015, she was entitled to the full maximum benefit of $6,000 per month after May 2, 2015. Bogdanovich noted that the "above calculations would be impacted if the Insured received any distributions from the practice post-disability. The 8/28/15 email states that the Insured reports no distributions starting 12/2014." *Id.* at US000422. Based

on the new calculations, Defendants determined that as of September 2015, Arrington had been underpaid by $30,146.89. Defendants paid Arrington benefits based on these calculations.

### III.    2015 Overpayment Determination

In March and May 2016, to ensure that they had correctly calculated the amount of Arrington's disability benefit, Defendants requested Arrington's 2015 tax returns. After learning that Arrington's tax information would be delayed because she had received a filing extension on her taxes, Defendants received a copy of her 2015 tax return on December 14, 2016. Arrington's Form W-2 showed that she had received $77,500 in salary in 2015. Since Arrington had not provided a Schedule K-1, Defendants specifically requested it. On February 7, 2017, Arrington provided a copy of her 2015 Schedule K-1, which reflected that she had received $627,500 in S-Corporation Distributions in 2015.

Having received these 2015 tax records, Defendants again referred Arrington's claim to Bogdanovich for review. Bogdanovich found that although Arrington had previously informed Defendants that she received no S-Corporation Distributions from BVC after December 2014, she had in fact received $627,500 in such distributions in 2015, which by itself was more than Arrington's pre-disability Monthly Pay. Therefore, these distributions fully offset her disability benefit. Defendants concluded that as a result, under the terms of the Policy, they should have paid her only the minimum monthly benefit of $100 for 2015 and had overpaid her benefits by $69,846.16. On March 7, 2017, Defendants sent Arrington a letter and an email in which they requested reimbursement for the overpayment, detailed the Policy provisions and financial documents they had reviewed, and described how they had calculated the overpayment. Also in March 2017, Defendants stopped sending Arrington benefits under the Policy and began withholding benefits in order to recover the amount of the overpayment.

## IV.    Administrative Proceedings

In response, Arrington retained an attorney, who sent a letter on April 3, 2017 to Defendants contesting the overpayment. Defendants forwarded the letter to Bogdanovich and asked her to review Arrington's arguments and determine whether the pre-disability Monthly Pay had been correctly calculated. Bogdanovich maintained her prior determination, relying in part on informal guidance from Defendants, which predated Arrington's claim, that discussed how S-Corporation Distributions were to be categorized under the Policy. On May 4, 2017, Defendants sent Arrington a letter in which they reviewed and rejected her arguments and affirmed their decision, requested reimbursement of the alleged overpayment, and provided her with instructions on how to appeal the decision.

In response to a request by Arrington, on October 5, 2017, Defendants asked Bogdanovich to provide any written documentation of the prior guidance she had received from Defendants that S-Corporation Distributions have been consistently included in a claimant's pre-disability Monthly Pay when the claimant is a principal of an S-corporation. Bogdanovich then located certain emails from September 2014 in which a Disability Claims Accountant on Defendants' staff told a CPA Risk Services accountant that Defendants had been treating S-Corporation Distributions as part of Monthly Pay pursuant to the definitions contained in the Policy.

On October 26, 2017, Arrington filed her appeal of Defendants' 2015 overpayment determination. While the appeal was pending, in December 2017, Defendants confirmed with Connie Cardamone of CPA Risk Services that they had "been consistent" in instructing CPA Risk Services on how to calculate the Monthly Pay for principals of S-corporations under the Policy's language. *Id.* at US000108. Cardamone suggested that Defendants change their calculation methodology, but Defendants decided that a change was not warranted based on the "policy

6

language." *Id.*; *see id.* at US001344–45. On December 14, 2017, Defendants informed Arrington that they had denied her appeal and affirmed their initial determination that her 2015 benefits were overpaid.

## V.    2016 Overpayment Determination

While Defendants and Arrington were communicating about the alleged overpayment for her 2015 benefits, Defendants sent her a letter on April 20, 2017 seeking her 2016 earnings information to evaluate whether they had correctly paid her benefits for 2016. Because Arrington had requested an extension on filing her 2016 tax returns, Defendants received her 2016 tax returns on October 26, 2017. The tax returns revealed that Arrington's salary had been further reduced to $49,500 in 2016. Defendants again referred the tax documents to Bogdanovich, who recommended that Defendants request Arrington's 2016 Schedule K-1 to ascertain whether she had received S-Corporation Distributions from BVC that year. On November 16, 2017, Arrington sent Defendants her 2016 Schedule K-1, which showed that Arrington had received $833,234 in distributions in 2016, which again exceeded Arrington's pre-disability Monthly Pay even without considering her wages. Based on these records, Bogdanovich stated that where the 2016 salary and S-Corporation Distributions surpassed Arrington's pre-disability Monthly Pay, she had suffered no "earnings loss." *Id.* at US001359. On February 7, 2018, Defendants informed Arrington that her 2016 disability benefits had been overpaid by $70,800 and requested reimbursement for both the 2015 overpayment and the 2016 overpayment.

On February 23, 2018, Arrington filed her Complaint in this Court pursuant to ERISA, 29 U.S.C. § 1132, appealing the partial denial of benefits for both 2015 and 2016. She requests a declaratory judgment that Defendants' overpayment determinations relating to her 2015 and 2016 disability benefits were erroneous and unreasonable and that she is entitled to the initially-

calculated benefits. She also seeks injunctive relief, costs, and fees. Defendants then filed a counterclaim against Arrington seeking reimbursement for the alleged overpayments of her disability benefits.

## DISCUSSION

Both Arrington and Defendants seek summary judgment on their claims. Defendants argue that the Court should apply an abuse of discretion review to their benefits determination, and that under that standard, their determination was reasonable and thus must be upheld. They further assert that if the Court finds that their benefits determination was reasonable, they are entitled to judgment in their favor on their counterclaim. Arrington argues that the proper standard of review in this case is *de novo*, that Defendants' determination was contrary to the plain, unambiguous language of the Policy and thus erroneous, or, in the alternative, that the decision was an abuse of discretion. She further argues that judgment is not warranted on Defendants' counterclaim because they have not properly alleged a claim for equitable relief. While Arrington exhausted her administrative remedies only as to the 2015 overpayment determination, she asks the Court to rule on the 2016 overpayment determination as well, because Defendants' reasoning and process were identical in both decisions. Defendants do not appear to oppose this request, so the Court will evaluate both the 2015 and 2016 overpayment decisions.

## I.      Legal Standards

### A.      Summary Judgment

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing a motion, the Court must believe the evidence of

8

the non-moving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

**B.      ERISA Standard of Review**

In reviewing a plan administrator's denial of benefits under 29 U.S.C. § 1132(a)(1)(B), a district court is to apply a *de novo* standard, unless the benefit plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where the benefit plan provides discretionary decisionmaking authority to the administrator, a district court's review is governed by an abuse of discretion standard, under which the administrator's decisions will not be disturbed, even if the court "would have come to a different conclusion independently," if it "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997) (quoting *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997)), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

Here, the Policy specifically states that the plan administrator "has the sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the policy," A.R. US000032, such that it would appear to require the Court to apply an abuse of discretion standard to the benefits determination. However, the parties dispute the enforceability of this provision. Arrington cites a provision of the Insurance Article of the Annotated Code of Maryland which provides that a "disability insurance policy may not be sold, delivered, or issued for delivery in the State by a carrier if the policy contains a clause that purports to reserve sole discretion to the carrier to interpret the terms of the policy." Md. Code Ann., Ins. § 12–211 (Michie 2017). A note to section 12–211 states that the provision, enacted in 2011, applies "to disability insurance policies sold, delivered, issued for delivery, or renewed in the State on or after October 1, 2011." *Id.* note.

Arrington argues that although the Policy was first issued in 2007, it was renewed or again "issued for delivery" after 2011, such that section 12–211 bars enforcement of the Policy's clause providing discretionary authority to the plan administrator. Defendants disagree for two reasons. First, they argue that the note to section 12–211 has no effect because it appears in the statute as a note, not a section or subsection. This argument is meritless. Section 12–211 was enacted through an amendment to the Insurance Article through House Bill 1085, which appears in Chapter 155 of the 2011 Laws of Maryland. In the enacted law, Section 1 corresponds to section 12–211(b), while Section 2 supplies the language contained in the note in the Annotated Code of Maryland, establishing that the prohibition on discretionary authority provisions in disability insurance policies would apply to policies issued or renewed after October 1, 2011. Act of Apr. 12, 2011, 2011 Md. Laws ch. 155. Maryland law provides that the Annotated Code, as published by the Michie Company and West, are "evidence" of the laws, but the laws actually consist of the bills

as passed by the Maryland General Assembly and appearing in the annual session laws. Md. Code Ann., Cts. & Jud. Proc. § 10–201 (Michie 2013); *Tereshuk v. State*, 503 A.2d 254, 257 (Md. Ct. Spec. App. 1986); *see also Wash. Suburban Sanitary Comm'n v. Pride Homes*, 435 A.2d 796, 799 n.4 (Md. 1981). Because it was part of the enacted bill, the text of the note specifying the prospective nature of section 12–211 is law in Maryland.

Defendants also argue that section 12–211 is inapplicable here because the Policy was not "sold, delivered, issued for delivery, or renewed on or after October 1, 2011." Md. Code Ann., Ins. § 12–211. Because BVC and Defendants executed the Policy on November 1, 2007, it is undisputed that the Policy was sold nearly four years before the effective date of the statute. As for whether the Policy was renewed since that date, Maryland law defines "renewal" for some types of insurance policies, but not for disability insurance policies, as "the issuance by an insurer of a new policy to replace an expiring policy issued by that insurer." *See id.* § 27–601.1 (defining renewal for personal insurance, private passenger motor vehicle liability insurance, commercial insurance, and workers' compensation insurance). The language of the Policy itself states that the Policy will terminate after a grace period if the premium goes unpaid, if the policyholder gives notice of termination, or if the Policy's minimum participation requirements are no longer met. The Policy does not provide for expiration after a definite period of time. *Cf. id.* The Policy defines its "anniversary" as each November 1 starting in 2008, A.R. US000007, and provides that premium amounts may be modified after the Policy's second anniversary and that on each anniversary, policyholders may request changes to the frequency of payments. However, the Policy nowhere states that the anniversary date is a renewal date, *see Owens v. Liberty Life Assurance Co.*, 184 F. Supp. 3d 580, 585 (W.D. Ky. 2016) (rejecting a claim that an insurance policy date was a renewal date where the policy did not so state), and neither Arrington nor the

Court has identified any legal authority stating that a Policy anniversary date is the equivalent of a renewal date under Maryland law. While the Policy provides for changes in premiums, those changes are not tied to the expiration of the Policy. The language of the Policy, therefore, evidences an intent for the Policy to continue indefinitely without renewal, until a condition for termination is met.

Arrington argues that the Policy was effectively renewed through the payment of each premium or through a change in the premium amount on the Policy's anniversary date. On the first point, Arrington has cited no persuasive authority stating that payment of a premium constitutes renewal of a long-term disability insurance policy with no express duration. The cases cited by Arrington relate specifically to health and accident insurance policies that "usually state exactly the duration of the risk assumed by the insurer." *World Ins. Co. v. Perry*, 124 A.2d 259, 263 (Md. 1956); *see also Reserve Ins. Co. v. Duckett*, 238 A.2d 536, 542 (Md. 1968) (addressing a car insurance policy containing an express expiration date). In *Perry*, the insurance policy at issue explicitly provided that to renew the policy, the policyholder must pay the premium and the insurer must acknowledge acceptance of the premium, and that the policy was renewed only as far as "such term as the payment shall cover." *Perry*, 124 A.2d at 261. While *Perry* stated generally that "a renewal of a policy by the payment of a new premium and the issuance of a receipt therefor, where there is no provision in the policy for its renewal, is a new contract," it did so in the context of discussing policies that provide "that its term shall end on the date when any renewal premium is due," and it did not address policies with no termination date. *Id.* at 262–63. Here, the Policy provides long-term disability insurance, its coverage is not time-limited, and it does not contain provisions for renewal through payment of premiums or otherwise. *Cf. id.* at 263 (distinguishing health and accident insurance, which "usually state exactly the duration of the risk assumed by the

12

insurer," from life insurance, which is "usually considered a continuing contract for the life of the insured" and for which questions regarding renewal "do not ordinarily arise"). While one of the ways the Policy may end is through nonpayment of premiums, the plain language of the Policy contemplates that it continues in effect, not that it is renewed, so long as the premium is paid before or during the grace period.

Arrington also points to statements or notices sent by Defendants to BVC referring to "renewal of your plan(s)," "renewal rates," and "renewal premiums" to argue that the Policy was "renewed" when premiums were paid after the date that section 12–211 went into effect. *E.g.*, Pl.'s Cross-Mot. Summ. J. Ex. 1-A, at 2, 4, ECF No. 29-4. Defendants have argued that the documents containing these statements are improperly submitted, extra-record evidence that the Court may not review on a motion for summary judgment on an ERISA claim. Even assuming that the Court may consider these records submitted with Arrington's Cross-Motion, they do not provide a basis to depart from the Policy's plain language. Although the documents use the term "renewal," it appears primarily as a header in tables comparing old and new premium rates and in notices that also reference the Policy's "anniversary" and "the monthly rate and premium changes effective" on the next anniversary date. *Id.* at 4, 5. The term "renewal" therefore appears as a short-hand for the change to rates and premiums to be effective on the next Policy anniversary, as provided for in the Policy. Such language cannot override the language of the Policy, which does not provide for renewal, and transform changes to premiums on the anniversary date into a renewal of a Policy that did not have to be renewed. *Cf. Owens*, 184 F. Supp. 3d at 585. Accordingly, the Policy was not "renewed" after October 1, 2011.

Finally, Arrington argues that the Policy was "delivered" or "issued for delivery" after 2011. Md. Code Ann., Ins. § 12–211 note. Arrington focuses on an endorsement to the Policy

dated November 1, 2013 and contends that the Policy should be deemed to have been issued or delivered on that date, after October 1, 2011, the effective date of section 12–211. Section 12–211, however, applies to "policies" delivered or issued after October 1, 2011. *Id.* An endorsement, or a rider, "is a writing added or attached to a policy" that amends the policy. *Staab v. Am. Motorists Ins. Co.*, 693 A.2d 340, 343 (Md. 1978) (quoting 2 Couch on Ins. § 18:17 (3d ed. 1996)). A policy and an endorsement are read "together as an integrated whole" to identify the terms, benefits, and coverage of an insurance contract. *Id.* (quoting *Erie Ins. Exchange v. Gosnell*, 230 A.2d 467, 471 (Md. 1967)). However, an endorsement "is not, itself, a policy." *Id.* at 344. Thus, although Defendants amended the Policy in 2013, the delivery of the endorsement does not constitute delivery of the Policy in 2013.

*Guardian Life Insurance Company v. Insurance Commissioner*, 446 A.2d 1140 (Md. 1982), does not compel a different conclusion. *Guardian Life* addressed a group health insurance policy issued to a Rhode Island bank as the trustee of an insurance fund established by employers in a particular industry. *Id.* at 1142–43. Eligible employers in that industry could apply to join the policy. *Id.* at 1143. When a Maryland employer later joined the policy, the insurer issued an "Employer Rider" to the company and benefits booklets to the covered employees. *Id.* at 1144. Where the issue before the court was whether the policy was issued in Rhode Island, where the trust agreement and policy were executed, or in Maryland, where the employer received the rider, the court held that the policy was issued in Maryland because the master policy issued to the bank policyholder did not actually insure anyone at the Maryland company, the rider was the instrument that actually allowed the employer to join the policy, and the Maryland employer did not join the policy until six years after its initiation. *Id.* at 1148–49.

Here, however, BVC's long-term disability insurance policy does not resemble the group health insurance policy at issue in *Guardian Life*. BVC, the holder of the Policy, is not a trustee of a multiple-employer trust fund, but the actual company whose employees received the benefits. Unlike the rider in *Guardian Life*, the endorsement to the Policy did not initiate the provision of benefits to BVC. Where the endorsement to the Policy was a mere amendment rather than the *de facto* policy itself, equating the rider to the policy in *Guardian Life* is not persuasive and does not provide a basis to conclude that the November 1, 2013 delivery of the endorsement effected a "delivery" of the Policy after October 1, 2011.

Because the Policy was sold to BVC in 2007, before section 12–211 was enacted, and because it was not renewed, delivered, or issued for delivery after October 1, 2011, the contract provision providing Defendants with discretionary authority to interpret the meaning of the Policy is enforceable. The Court will therefore review Defendants' benefits determination under an abuse of discretion standard.

### C.    Abuse of Discretion Standard

Under an abuse of discretion standard, the plan administrator's discretionary decision will not be disturbed "if it is reasonable, even if [the court] independently would have come to a different conclusion." *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 344 (4th Cir. 2000). A reasonable decision "is the result of a deliberate, principled reasoning process and . . . supported by substantial evidence." *DuPerry v. Life Ins. Co.*, 632 F.3d 860, 869 (4th Cir. 2011). Discretion over interpretation of a policy provision "does not confer discretion to alter the plan's terms or to read out unambiguous provisions." *Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d 170, 176 (4th Cir. 2005), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008); *see D&H Therapy Assocs. v. Bos. Mut. Life Ins. Co.*, 640 F.3d 27,

41 (1st Cir. 2011) (holding that a plan abused its discretion in interpreting its policy "in a fashion contrary to its terms"). However, if the language of the policy is "ambiguous" such that it "gives rise to at least two different but reasonable interpretations," the administrator has discretion to interpret the provision in a reasonable way. *Colucci*, 431 F.3d at 176. Even if the claimant's interpretation of the policy's language is "more reasonable," "perfectly consistent with a careful reading of its express terms," and "more subjectively compelling," the plan administrator's reading will still be upheld so long as its alternative is reasonable. *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1188, 1190 (4th Cir. 1989).

The United States Court of Appeals for the Fourth Circuit has stated that in assessing the reasonableness of a plan administrator's decision, courts are to consider the following nonexclusive factors: (1) the language of the plan; (2) the purpose and goals of the plan; (3) the adequacy of the materials considered and the degree to which they support the decision; (4) whether the administrator's interpretation was consistent with other provisions and earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any potential conflict of interest. *Booth*, 201 F.3d at 342–43; *see also Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010).

## II.     Benefit Determination

The parties' dispute centers on whether Arrington's S-Corporation Distributions as reported on her Schedule K-1 were properly classified as part of her pre-disability Monthly Pay and properly offset against the benefit amount otherwise due to her. To determine the amount of

monthly benefits paid under the Policy, the plan first calculates the claimant's pre-disability

Monthly Pay. The Policy defines that term as follows:

> *Monthly pay* must be from the *policyholder* or an *associated company*, is determined on the day before the *period of disability* starts, and means:
>
> For principals of a partnership:
>
>> a monthly average of the amount reported as ordinary income on Schedule K-1 of IRS Partnership Return of Income Form 1 065, or their successor forms, for the prior full calendar year.*
>
> For principals of a proprietorship, professional corporation, professional association, or sub-chapter S corporation:
>
>> a monthly average of the disabled person's draw or salary received during the prior full calendar year.*
>
> *If you have been a principal for less than a full calendar year, *monthly pay* will consist of a monthly average of the draw or salary you received during the time you were a principal. Profits, dividends, or returns of capital will not be included.

A.R. US000020. Next, the plan calculates the "Schedule Amount," which consists of 60 percent

of that Monthly Pay but cannot exceed $6,000 per month, which is the maximum benefit under the

Policy. From the Schedule Amount, the plan subtracts the "Offset Amount," consisting of certain

other disability or retirement benefits to which the claimant is entitled, and, to the extent it exceeds

the claimant's pre-disability Monthly Pay, post-disability income received from "Other Sources,"

which include "any salary, wages, partnership or proprietorship draw, commissions, or similar pay

from any work you do" and "any amount you receive of a type included in your *monthly pay* for

the purpose of determining your *long term disability insurance* benefit under the *policy*." *Id.* at

US000020, US000024–25. If these offsets equal or exceed the amount of the claimant's pre-

disability Monthly Pay, the claimant receives the Policy's minimum benefit of $100 per month.

Arrington is both an owner and employee of BVC, a sub-chapter S-corporation. Defendants included the S-Corporation Distributions Arrington received as a principal and the salary she earned from BVC in her 2013 pre-disability Monthly Pay. When calculating her 2015 and 2016 post-disability earnings and concluding that such income fully offset her disability benefit, Defendants again included Arrington's salary for working for BVC and her S-Corporation Distributions from owning BVC. In the March 7, 2017 email informing Arrington of their conclusion that her 2015 benefits were overpaid, Defendants stated that because Arrington's 2015 salary and S-Corporation Distributions offset her benefit, she was entitled to only the minimum benefit of $100 per month.

In their December 14, 2017 letter denying Arrington's appeal, Defendants for the first time stated their reasons for including the S-Corporation Distributions in the calculated Monthly Pay. First, Defendants asserted that where the Policy's definition of Monthly Pay for principals of an S-corporation includes the salary or draw "received" by the principal, *id.* at US000020, and distributions listed in Box 16D of Schedule K-1 constitute money actually "received by the principal," rather than money merely earned by the principal or the S-corporation, that amount is included in Monthly Pay. *Id.* at US001367. Second, Defendants claimed that whether S-Corporation Distributions are returns of capital makes no difference, because the sentence in the definition of Monthly Pay stating, "Profits, dividends, or returns of capital will not be included," applies only to claimants who have been a principal for less than a full calendar year. *Id.* According to Defendants, that sentence's juxtaposition with the immediately preceding sentence referencing such new claimants and its location with that sentence after an asterisk make clear that the two sentences are read together. Third, Defendants discount the language in the Disability Claims Reference Manual that states that the "Profits, dividends, or returns of capital will not be

18

included" sentence applies to all claimants who are principals of S-Corporations, because the Manual only "provide[s] general information regarding many different issues found in the processing of many different policies" and is not a binding document that overrides the Policy's language. *Id.* Finally, Defendants asserted that when the principal of an S-corporation also works for the S-corporation, that principal's work "increase[s] the earnings of the S-corporation," which in turn increases the principal's share of the earnings of the corporation, which are reported on Schedule K-1, and which are effectively returned to the principal through the S-Corporation Distributions listed in Box 16D of Schedule K-1. *Id.* Therefore, they asserted, S-Corporation Distributions, though not taxed, are fairly included in "the salary, wages, partnership or proprietorship draw, commissions or similar pay from the work the principal performed and earned for the corporation, and that they are now receiving" that constitute Other Sources of income that can offset the benefit due under the Policy. *Id.* Based on this reasoning, the Defendants concluded that their interpretation was not contrary to the terms of the Policy.

Arrington challenges Defendants' interpretation of the Policy as contrary to its plain terms and therefore an abuse of discretion. First, Arrington asserts that Defendants' interpretation is unreasonable because the terms "draw" and "salary," used in the definition of Monthly Pay, are terms of art under the Internal Revenue Code (the "Code"), and that "draw" refers to partnership and proprietorship compensation and not to S-Corporation Distributions or other compensation for S-corporation principals. Second, Arrington asserts that Defendants' interpretation is wrong because the Policy does not specifically state that Monthly Pay for S-corporation principals includes distributions on IRS Form 1120S Schedule K-1, where the Policy specifically includes as Monthly Pay for partners in a partnership amounts listed in a specific IRS form, Form 1065 Schedule K-1. Third, she argues that Defendants' inclusion of S-Corporation Distributions in

Monthly Pay is inconsistent with the sentence, "Profits, dividends, or returns of capital will not be included," that the sentence applies to all principals of S-corporations, not just those who have been principals for less than a full calendar year, and that Defendants' reading has no logical justification. Arrington argues that S-Corporation Distributions, as a matter of law, are returns of capital, such that pursuant to this sentence, they may not be included in Monthly Pay.

## A.    Policy Language

The first of the *Booth* factors applicable to the analysis of the reasonableness of a plan determination is the language of the plan. *Williams*, 609 F.3d at 630. Each of Arrington's specific objections relate to the proper interpretation of the language of the Policy. At the hearing on the Motions, Defendants appropriately conceded that the sentence stating that "Profits, dividends, and returns of capital are not included" in Monthly Pay applies to calculations relating to all S-corporation principals, not just those who have been principals for less than one year. Defendants' prior interpretation was untenable because that language unambiguously applies to all principals. There is nothing in the text of the Policy that limits the sentence to those who have been principals for less than one year, its placement after an asterisk in a footnote simply signifies that it is relevant to both categories of claimants marked by the corresponding asterisk, and there is simply no logical reason that such language would be limited to principals for less than one year. Defendants' concession, however, does not end the inquiry, because the parties also dispute whether Arrington's S-Corporation Distributions reported in Box 16D of her Schedule K-1 can reasonably be deemed to be "draw or salary," and thus properly included in the calculation of her pre-disability Monthly Pay, or whether they necessarily constitute a "profit, dividend, or return of capital" and must be excluded from that calculation.

The Policy's language is not so clear on these questions that it can be deemed "unambiguous" and not subject to Defendants' discretion to interpret it. *Colucci*, 431 F.3d at 176. Contrary to Arrington's argument, the Court does not find that "draw" is so clearly a tax term of art relating to partnerships that it can never refer to S-Corporation Distributions. While the term "draw" is not used in the Code provisions or regulations relating to S-corporations, *see* 26 U.S.C. §§ 1361–1379 (2012); 26 C.F.R. §§ 1.1361–0 through 1.1378–1 (2018), it is also not used in the Code provisions governing partnerships, *see* 26 U.S.C. §§ 701–761, and appears only through the related term "drawings," which appears three times in the partnership regulations, *see* 26 C.F.R. § 1.731–1(a)(1)(ii) (referring to "advances or drawings of money or property against a partner's distributive share of income"); *id.* § 1.737–1(b)(3)(ii) (same); *id.* § 1.751–1(b)(1)(ii) (same). Notably, in a case cited by Arrington, the United States Tax Court, which specializes in tax matters, has referred to S-corporation Distributions as "draw." *See D'Errico v. Comm'r*, 103 T.C.M. (CCH) 1802, 2012 WL 1889262, at *12, 13 (T.C. 2012). Since Arrington has not identified legal authority establishing that the term draw refers strictly to partnership compensation, and since the term has also been used to refer to compensation for principals of S-corporations, Defendants' treatment of S-Corporation Distributions as falling within the term "draw" in the definition of Monthly Pay was not unreasonable.

The Court also does not find that the Policy's explicit statement that Monthly Pay includes amounts listed in IRS Form 1065 Schedule K-1, completed by partnerships, necessarily means that absent a similar direct reference to the relevant IRS form, S-Corporation Distributions listed in Form 1120S Schedule K-1 cannot be included in Monthly Pay. Partnerships file Form 1065 Schedule K-1, and partners, who are not employees of the partnership, do not receive a Form W-2 and instead include in their individual Forms 1040 the amounts of partnership income they

received as listed in their Form 1065 Schedules K-1. In contrast, principals of "a proprietorship, professional corporation, professional association, or sub-chapter S corporation" use different IRS forms, or sets of forms, depending on the applicable business entity used, and in the case of S-corporations, the principal has the ability to choose to receive payments from the S-corporation in multiple different ways, including salary reported on a Form W-2 and distributions listed in Form 1120S Schedule K-1. Thus, the language in the Policy identifying the specific tax form for principals of a partnership, but not for principals of other types of entities, could reasonably reflect the more uniform way in which partners are paid and taxed, as addressed in Form 1065, as compared to the disparate ways in which principals of the other types of businesses are paid and taxed, which are not easily defined by reference to a single tax form. Indeed, the reference to Form 1065 Schedule K-1 in relation to Monthly Pay for principals of a partnership is the exception, not the rule. There are no other references to specific IRS tax forms, or the Code in general, in the definition of Monthly Pay, even though Monthly Pay for individual employees and certain business owners plainly includes taxable income listed in IRS Form W-2 or another IRS form. Thus, the Court rejects the argument that the failure to reference the specific IRS form on which S-Corporation Distributions are listed precludes their inclusion in Monthly Pay. Defendants' decision to include in Monthly Pay S-Corporation Distributions from Arrington's Form 1120S Schedule K-1, in addition to her salary listed in her Form W-2, was reasonable.

Finally, Arrington has not established that the S-Corporation Distributions identified in Box 16D of her Schedule K-1, as a matter of law, constitute "profit, dividend, or return of capital" excluded from the definition of Monthly Pay. Arrington contends that since her tax returns show that the amounts listed in Box 16D were not taxed, they were by definition nontaxable returns of capital. Arrington's citations to the Code, however, do not stand for this proposition. 26 U.S.C.

22

§ 301(c), discussing distributions of property by corporations in general, without specific reference to S-corporations, provides that a "distribution" may or may not be a dividend, that it may be taxable or not, and could be, but is not always, treated as a capital gain. 26 U.S.C. § 301(c). 26 U.S.C. § 1368, which discusses distributions made by an S-corporation, provides that their tax treatment may differ depending on whether the S-corporation has earnings or profits, and whether the distribution exceeds the adjusted basis of the stock. *Id.* § 1368(a)–(c). Neither provision clearly defines S-Corporation Distributions reported in Box 16D as "return of capital" or "profit." *See id.* §§ 301(c), 1368. More fundamentally, these provisions define whether and how such distributions are taxed, but the Policy does not state that the definition of Monthly Pay is dependent on whether the payments in question are taxable under the Code, or even whether the terms in the Policy such as "return of capital" are defined with reference to how such terms would be used in the Code.

Where S-Corporation Distributions are not defined in statute as "return of capital," Arrington relies on *Dynamo Holdings Limited Partnership v. Commissioner*, Nos. 2685-11, 8393-12, 2018 WL 2107977 (T.C. 2018), in which the United States Tax Court stated, in discussing distributions of property made by a corporation to a shareholder under 26 U.S.C. § 301(c), "If all or part of the distribution is not a dividend, that amount is a nontaxable return of capital to the extent of the shareholder's adjusted basis in the stock and any amount in excess of the shareholder's adjusted basis is taxable capital gain." *Id.* at *32. This language from a single case, which did not address S-corporations specifically, does not establish that the term "return of capital" as used in the Policy necessarily includes all S-Corporation Distributions. *See id.*; *see also D'Errico*, 2012 WL 1889262, at *1, 12 (discussing "nontaxable return of capital" in the context of a C-corporation). Similarly, in *Rogers v. Commissioner*, No. 2266-07, 2011 WL

5885083 (T.C. 2011), another case relied on by Arrington, the Tax Court recounted the rules governing taxation of distributions from S-corporations in 26 U.S.C. §§ 1366–1368 and addressed whether "a statutory or legal principle applie[d] to remove" the distribution at issue from those rules, as the sole shareholder of the S-corporation contended. *Id.* at \*4. Although stating that certain distributions, under certain conditions, would be deemed a "nontaxable return of capital," *Rogers* does not state that items reported in Box 16D of Schedule K-1 are necessarily returns of capital and does not illuminate the meaning of the phrase under the Policy, especially when the Policy does not explicitly tie its definition of "return of capital" to treatment under the Code.

Indeed, in the case of an S-corporation principal who also works for the company, S-Corporation Distributions could be deemed to be compensation for work performed for the company, depending on the specific facts at issue. For example, in *Veterinary Surgical Consultants, P.C. v. Commissioner*, 117 T.C. 141 (T.C. 2001), the sole employee and principal of the S-corporation reported on his tax return no salary or wages and instead listed only distributions from the S-corporation's earnings. *Id.* at 143. The court determined that because the principal performed veterinary services for the company, the distributions "constituted remuneration for services performed" by the principal for the S-corporation, even though they were listed on Schedule K-1 as distributions from accumulated earnings and profits. *Id.* at 143, 145.

Although Arrington argues that her case is distinguishable in that she separately collected a salary for her work performed for her company, *Veterinary Surgical Consultants* illustrates, as both parties agreed at the hearing, that there are scenarios where S-Corporation Distributions should be treated as compensation for work performed, rather than profits, dividends, or returns of capital. *See id.*; *see also Kukowski v. Fortis Benefits Ins. Co.*, No. 99-1512, 2001 WL 474321, at \*2–3, 6 (D. Minn. May 2, 2001) (holding, under substantially similar policy language, that it was

24

reasonable for a disability plan administrator to reject an S-corporation principal's argument that the distributions received were returns on investment where the principal performed work for the S-corporation, took no salary or wages, and "provided no compelling evidence" to show that the distributions were a return on investment).  Since S-corporation principals have the ability to characterize revenue from the business in multiple ways, and Defendants do not necessarily know from the face of a tax return whether S-Corporation Distributions reflect pay for work performed, it is not unreasonable for Defendants to take the approach that all S-Corporation Distributions will be considered "draw" for principals of S-corporations, at least in the absence of specific evidence to the contrary.  Notably, in the normal course, Defendants' interpretation neither advantages nor disadvantages a disability claimant.  By including S-Corporation Distributions in Monthly Pay, this approach will usually result in a higher pre-disability Monthly Pay calculation which, in turn, would likely render a claimant eligible for a larger disability benefit than would be provided upon consideration of salary or wages alone.  Because S-Corporation Distributions would be factored into both the pre-disability Monthly Pay calculation and the Other Sources of post-disability income used to offset the benefit amount, inclusion of S-Corporation Distributions as "draw" for both purposes is reasonable and not inequitable.

Furthermore, Defendants' interpretation was reasonable as applied to Arrington.  Before having any knowledge of Arrington's large S-Corporation Distributions in 2015 and 2016, Defendants included her 2013 S-Corporation Distributions in the calculation of pre-disability Monthly Pay, thereby increasing the baseline for determining the benefit amount.  Even in the absence of her 2015 and 2016 Schedules K-1, Defendants paid benefits based on that higher pre-disability Monthly Pay calculation and sought an adjustment only when it received those documents showing for the first time that Arrington had received particularly substantial amounts

of S-Corporation Distributions. Significantly, Arrington did not provide specific evidence to Defendants to establish that the distributions she received were not connected to her work for BVC. Based on these facts, the Court also notes that Defendants' determination is not suspect due to their financial motives or any potential of conflict of interest. *See Williams*, 609 F.3d at 630.

Finally, the Court notes that under the language of the Policy, the exclusion of "profits, dividends, or returns of capital" applies only to the calculation of Monthly Pay. The "Other Sources" of post-disability income that could offset Arrington's benefit include not only "any amount you receive of a type included in your *monthly pay*," but also "any salary, wages, partnership or proprietorship draw, commissions, or similar pay from any work you do," without any exclusion of "returns of capital." A.R. US000025. Thus, where "Other Sources" encompasses a wider range of sources of income than does Monthly Pay, and Arrington's S-Corporation Distributions in 2015 and 2016 were sufficiently substantial that they effectively offset the Schedule Amount, they could reasonably be deemed to be "similar pay from any work" performed by Arrington that would have reduced Arrington's benefit without consideration of the exclusions relating to Monthly Pay. The Court therefore concludes that regardless of whether there are alternative or even better interpretations of how S-Corporation Distributions should be treated under the Policy language, Defendants' interpretation was reasonable.

### B.    Additional Factors

Consideration of the other *Booth* factors does not alter this conclusion. Defendants' inclusion of S-Corporation Distributions in Monthly Pay and as an offset to the benefit amount is consistent with the purposes and goals of the plan. The purpose of the Policy is "to partly replace income lost during periods of disability that result from injury, sickness, or pregnancy." A.R. US000019; *see Williams*, 609 F.3d at 630. Furthermore, the Policy warns beneficiaries that their

26

benefit under the Policy may be reduced if they receive "benefits from other sources." A.R. US000019. While that language generally refers to other insurance benefits, such as Social Security payments or benefits under another long-term disability insurance policy, these provisions reveal the Policy's broader goal of ensuring that claimants have sufficient resources during a period of disability to maintain their standard of living generally, not necessarily to replace all lost income. The fact that the Policy also undisputedly subtracts from the benefit amount a claimant's post-disability income from "Other Sources" to the extent it exceeds the pre-disability Monthly Pay confirms that the Policy is intended not to replace all lost income, but to permit claimants to meet their financial needs during the period of disability. Where Defendants' interpretation results in the minimum benefit because Arrington's post-disability S-Corporation Distributions give her not merely sufficient resources, but more resources upon which to live during her period of disability, it was reasonable in light of Policy's purpose and structure.

In the same way, Defendants' interpretation was consistent with other provisions and earlier interpretations of the Policy. *See Williams*, 609 F.3d at 630. As discussed above, although Defendants considered Arrington's post-disability S-Corporation Distributions as an offset to the Schedule Amount, they had, from the outset, consistently included pre-disability S-Corporation Distributions as part of her pre-disability Monthly Pay. Moreover, Defendants provided evidence that their treatment of S-Corporation Distributions was consistent with their past practice. Bogdanovich, when reviewing Arrington's arguments disputing the overpayment, noted that her interpretation matched prior instructions from Defendants regarding interpretation of the Policy's language for principals of an S-corporation. Specifically, in September 2014, before Arrington had filed a disability claim, Connie Cardamone of CPA Risk Services sent an email to Defendants' Disability Claims Accountant asking whether pursuant to the Policy's language, she should include

27

in pre-disability Monthly Pay for a principal of an S-corporation both salary reported on a Form W-2 and S-Corporation Distributions reported on Schedule K-1. Defendants' accountant instructed Cardamone in a September 5, 2014 email to include the S-Corporation Distributions from Box 16D of the principal's Schedule K-1 and stated that for S-corporations, "we look at wages and distributions rather than ordinary income." A.R. US000965. During Arrington's appeal, upon inquiry from a representative of Defendants, Cardamone confirmed that Defendants had consistently instructed CPA Risk Services to treat S-Corporation Distributions in the same way, though she noted that CPA Risk Services had recommended changing that approach and that Defendants had declined to do so based on the "policy language." *Id.* at US000108. At the same time, however, Defendants have identified no internal guidance document or manual stating that S-Corporation Distributions were to be included in Monthly Pay and as Other Sources of post-disability income. They likewise have provided no evidence that Defendants had previously evaluated the specific Policy language and explained how their approach was consistent with it. Defendants' evidence of their prior practice, consisting of a single informal email exchange and a post-appeal telephone call with their contractor, is therefore notably thin. Nevertheless, because it is not refuted by any evidence of any contrary prior practice, the Court finds that this factor weighs slightly in favor of Defendants.

The record also shows that Defendants "substantially" complied "with the spirit" of the substantive and procedural requirements of ERISA and its regulations with respect to most requirements. *Ellis*, 126 F.3d at 235 (holding that "substantial compliance with the spirit of the regulation will suffice"); *see Williams*, 609 F.3d at 630. An ERISA plan must "provide adequate notice in writing" to a claimant of a denial of a claim "setting forth the specific reasons for such denial" and afford the claimant "a reasonable opportunity" for "a full and fair review" of the denial.

29 U.S.C. § 1133. The regulations implementing that provision specify that the notice must provide (1) "[t]he specific reason or reasons for the adverse determination"; (2) the specific plan provisions on which the determination was based; (3) a description of "any additional material or information" that could be submitted to alter the result and why that information is necessary; and (3) information on the claimant's right to challenge or appeal the determination. 29 C.F.R. § 2560.503-1(g)(1). The notice of denial must contain "a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review." *Ellis*, 126 F.3d at 235 (quoting *Brogan v. Holland*, 105 F.3d 158, 165 (4th Cir. 1997)).

In informing Arrington that her benefits were overpaid, Defendants sent both an email and a letter on March 7, 2017, with the email describing the overpayment with references to the relevant Policy provisions and the documents she had provided and informing her that she could submit additional documentation. After Arrington disputed her claim, Defendants sent another letter on May 4, 2017, explaining that the overpayment calculation was based on their interpretation that S-Corporation Distributions are to be included in Monthly Pay, referring to Policy provisions, describing what documents they consulted, informing her of her right to appeal and her right to submit additional evidence, and appending appeal forms and information. Finally, on December 14, 2017, when denying Arrington's appeal and affirming the overpayment determination, Defendants sent Arrington a letter explaining the denial, referring to the Policy provisions and tax documents they consulted, providing the reasoning behind their original decision, responding to the arguments that she made at the time of the initial determination and on administrative appeal, informing her of her further appeal rights, and offering her an opportunity to submit more evidence. Through these communications, Defendants substantially complied with

ERISA's notice requirements. Where Arrington was represented by counsel throughout the process, Defendants provided the required information in a manner that the attorneys could understand.

Arrington argues that Defendants' general statements informing her that she could submit additional documentation in support of her position were insufficiently specific to meet the notice requirements. In *Gagliano v. Reliance Standard Life Insurance Co.*, 547 F.3d 230 (4th Cir. 2008), cited by Arrington, the court found that the letter notifying the plaintiff that her benefits had been terminated did not achieve substantial compliance with ERISA's requirements because it did not inform her that she had a right to an administrative appeal or an appeal to federal court and simply stated that the plan would "be happy to consider any additional information." *Id.* at 233, 237. Here, although Defendants' letters described the appeal process sufficiently, they did not identify the particular documentation they required to change their position and award Arrington the original benefit. Because Defendants presently argue that Arrington should have provided documentation and records that would establish that her S-Corporation Distributions were, as a factual matter, a return of capital rather than a draw or compensation for the work she performed at BVC, Defendants should have more specifically identified the need for such documentation in their communications to Arrington. However, while this imperfection prevents this factor from unequivocally favoring Defendants, Defendants did not have "an obligation to inform her of what she needs to tell [them] in order to obtain disability benefits." *Ellis*, 126 F.3d at 235. Where Defendants met the general requirement by providing a statement of their reasons that "permitted a sufficiently clear understanding of [their] position to permit effective review," *id.*, this factor generally weighs in favor of Defendants.

One *Booth* factor on which the record is mixed is whether the decisionmaking process was "reasoned and principled." *See Williams*, 609 F.3d at 630. On the one hand, parts of the process were iterative and thorough, and Defendants considered all documentation submitted by Arrington. At each step of the assessment of Arrington's pre-disability Monthly Pay and post-disability earnings, at least three individuals independently reviewed Arrington's claim to ensure that the calculations were correct: Philip Livers, the analyst assigned to Arrington's claim; Dave Orjala, who double-checked Livers's work; and Judy Bogdanovich, Defendants' outside accountant. They considered the claim forms submitted by Arrington, Arrington's pay stubs, BVC's payroll information, and Arrington's tax records, which detailed her salary from working as a veterinarian for BVC and the distributions she received from BVC. When Arrington disputed their determination, Defendants asked Bogdanovich to review the arguments and respond. After Arrington filed a formal appeal, Livers, who had handled Arrington's claim for years, was not involved; rather, a different reviewer, Susan Brockman, conducted the assessment. These aspects of the process were principled.

However, throughout their review process, Defendants did not address in detail whether their inclusion of S-Corporation Distributions in Monthly Pay and Other Sources comported with the terms of the Policy. Even when Arrington challenged that determination, Defendants relied principally on the fact that they had previously interpreted the Policy in that manner, without analysis of the actual language of the Policy. Then, in responding to Arrington's citation to the Policy language excluding "profits, dividends, or returns of capital" from Monthly Pay, Defendants propounded an unreasonable and illogical interpretation of that language as applicable only to S-Corporation principals who joined their companies within the past year, and rationalized away language in a Disability Claims Reference Manual that squarely refuted that interpretation,

only to abandon that position at the hearing on the Motions. In making their benefits determination and denying Arrington's appeal, Defendants also failed to engage to any significant degree on the key question of whether S-Corporation Distributions are, as a matter of law, returns of capital. Thus, there were aspects of Defendants' decisionmaking process that relied on flawed or incomplete reasoning.

Nevertheless, Defendants reasonably concluded that where a principal actually performs work for an S-corporation and thus contributes to its overall earnings, its distributions could, for purposes of the Policy, be fairly characterized as "pay from the work the principal performed and earned for the corporation" that would constitute "Other Sources." A.R. US001367. They also reasonably based the determination on their conclusion that the Policy and its terminology does not necessarily align in all respects with the Code. Thus, while the Defendants' decisionmaking process was imperfect in certain ways, it was sufficiently reasoned and principled that this factor favors neither side.

Although the *Booth* factors do not unequivocally weigh in Defendants' favor, taken together, and particularly because the determination was ultimately based on a reasonable interpretation of the Policy language, the Court concludes that Defendants' determination was a reasonable one and that it was sufficiently "supported by substantial evidence" and "the result of a deliberate, principled reasoning process" that it was not an abuse of discretion. *Ellis*, 126 F.3d at 232; *cf. Kukowski*, 2001 WL 474321, at *6–7 (holding that a plan's interpretation of similar policy language to include in monthly pay income actually received rather than income to which the claimant is entitled was reasonable). In so concluding, the Court does not find that it was the only reasonable interpretation, the most reasonable interpretation, or the one that the Court would have adopted. *Ellis*, 126 F.3d at 232. Nevertheless, Defendants' Motion for Summary Judgment

on Arrington's claim will be granted, and Arrington's Cross-Motion for Summary Judgment will be denied. Because the Court finds in Defendants' favor, it does not reach the argument that remand is the appropriate remedy.

## III. Defendants' Counterclaim

Defendants also seek summary judgment on their counterclaim in which they seek an order from the Court requiring Arrington to repay the amount of the overpayment to Defendants. Defendants argue that if the Court finds in their favor on the benefit determination, they are entitled to the requested order. Arrington, however, contends that since Defendants have not asserted an appropriate claim for equitable relief under ERISA, they are not entitled to summary judgment.

ERISA authorizes a participant, beneficiary, or fiduciary of an ERISA plan to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 26 U.S.C. § 1132(a)(3). The party seeking relief must show that both "the basis for the . . . claim" and "the nature of the underlying remedies sought" are equitable in nature. *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 657 (2016). Defendants have acknowledged that this legal standard applies to the consideration of their counterclaim.

A claim to enforce an equitable lien by agreement has an equitable basis. *Id.* at 658. An ERISA plan creates an equitable lien by agreement when, under the terms of the plan, one party agrees "to convey a particular fund to another party." *Id.* Here, the Policy provides that if Defendants discover that they paid the wrong benefit amount, the amount will be adjusted. If Defendants overpaid the claimant, the Policy requires the claimant to reimburse them. Specifically, when Arrington signed and submitted her disability claim, she agreed that Defendants

had "the right to recover . . . overpayments from me" if she received a benefit greater than what she was due. A.R. US000169. Because the Policy and the disability claim together created an agreement between Arrington and Defendants that Arrington would return any specific overpaid benefit, the Policy created an equitable lien by agreement. Therefore, the basis of Defendants' claim is equitable. *See Montanile*, 136 S. Ct. at 658.

Defendants must also show that the remedy they seek is equitable. Claims by a plan against a claimant for reimbursement under the terms of a plan generally proceed under a restitution theory. *See Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212–13 (2002). The restitution remedy is equitable — rather than legal — and therefore "appropriate equitable relief" under ERISA only in circumstances where the money in dispute is in the possession of the claimant and is identifiable, such that the source of the funds stems from the transaction in dispute, even though the exact location or form of the funds need not be shown. *See Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 363 (2006) (holding that a plan could seek reimbursement under ERISA where the funds in dispute were held in a specific investment account belonging to the defendants, because the money sought was located in "a specifically identified fund, not from the [defendants'] assets generally"); *see also U.S. Airways, Inc v. McCutchen*, 569 U.S. 88, 93, 95 (2013) (stating that the plan could seek equitable reimbursement from a claimant pursuant to ERISA where some of the funds sought were held in escrow for the defendant and the remainder was in the defendant's possession). In comparison, restitution is not available pursuant to ERISA where the relief requested would "impose personal liability on the defendant" by seeking money out of the defendant's general assets, since that is a legal remedy. *Knudson*, 534 U.S. at 214 (holding that the plan could not seek reimbursement under ERISA where the funds sought had been disbursed to a trust and to the defendant's attorney and were not in the defendant's possession). Consistent

with these principles, the United States Supreme Court has held that a plan cannot seek reimbursement from a claimant where the insured received the disputed funds but spent the funds on "nontraceable items, like food or travel." *Montanile*, 136 S. Ct. at 658–59, 662. In contrast, equitable restitution would still be an available equitable remedy where the defendant had spent the money on "traceable items," such as a car. *Id.* at 658. While neither the Supreme Court nor the Fourth Circuit has decided whether the identifiable funds must be in a separate account or can be recovered even if commingled with other funds controlled by the defendant, the United States Court of Appeals for the Ninth Circuit has suggested that the funds need not be segregated into a separate account. *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 662 (9th Cir. 2019). The court further clarified that for the funds to be identifiable, the party seeking relief must designate a specific amount of money due. *Id.*

In their counterclaim, Defendants request reimbursement of the $140,172.85 overpayment paid to Arrington in 2015 and 2016. Defendants have not alleged where Arrington kept these funds, whether she still retains them, or whether she has used them to buy traceable property or nontraceable goods. In their reply brief, Defendants state that the funds were "delivered to the possession of the Plaintiff," but they do not state or claim that she still possesses them. Defs.' Reply 17, ECF No. 30. The parties do not identify, and the Court could not locate, any evidence in the record that describes the disposition of the funds. At the hearing, Defendants acknowledged that they did not put forward evidence regarding the present location of the funds and that they may have to recoup the overpayment by withholding Arrington's monthly benefits until they are reimbursed in full. As a result, the Court does not have sufficient information upon which to determine whether the Defendants can succeed on their equitable claim and therefore cannot grant

summary judgment to Defendants on their counterclaim. Accordingly, Defendant's Motion will be denied as to the counterclaim.

## CONCLUSION

For the foregoing reasons, Arrington's Cross-Motion for Summary Judgment will be DENIED. Defendants' Cross-Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART. It is denied as to the Defendants' Counterclaim and is otherwise granted. A separate Order shall issue.

Date: June 21, 2019

THEODORE D. CHUANG
United States District Judge